**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
CHARLES BODENBURG,

                            Petitioner,

              -against-

JAMES CONWAY, Superintendent of Attica
Correctional Center,

                         Respondent.
------------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
05-cv-01119-ADS

**APPEARANCES**

**CHARLES BODENBURG**
<u>Pro Se</u> Petitioner
01-A-3491
Auburn Correctional Facility
135 State Street, Box 618
Auburn, NY 13024

**ALAN M. NELSON, ESQ.**
Appointed counsel for the Petitioner
3000 Marcus Avenue
Lake Success, NY 11042

**THOMAS J. SPOTA**
District Attorney of Suffolk County
Criminal Courts Building
200 Center Drive
Riverhead, NY 11901-3388
         By:    Marion M. Tang, Assistant District Attorney

**SPATT, District Judge.**

Presently before the Court is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Charles Bodenburg ("Bodenburg" or the "Petitioner"). For the reasons that follow, the petition is denied.

## I. BACKGROUND

### A. Procedural History

Bodenburg petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus. The Petitioner seeks relief from his June 7, 2001 conviction, following a bench trial in Supreme Court, Suffolk County, New York (Corso, J.), for one count of depraved indifference murder in the second degree. The charges arose out of the August 30, 1999 death of three-year-old Kayla Zachman ("Kayla").

After conviction, the Petitioner was sentenced to an indeterminate term of 25 years to life imprisonment. The New York Appellate Division, Second Department, affirmed the conviction, People v. Bodenburg, 7 A.D.3d 534, 775 N.Y.S.2d 595 (2d Dep't 2004), and the New York Court of Appeals denied leave to appeal, People v. Bodenburg, 3 N.Y.3d 657, 816 N.E.2d 572, 782 N.Y.S.2d 699 (2004).

On February 24, 2005, Bodenburg filed a § 2254 petition, alleging: (1) that his confessions were improperly admitted at trial; (2) prosecutorial misconduct; (3)

insufficiency of the evidence; and (4) ineffective assistance of trial counsel.  On March 29, 2005, the Court appointed counsel to represent the Petitioner.

On October 20, 2005, the Petitioner's appointed counsel submitted a memorandum in support of his petition for a writ of habeas corpus.  In the memorandum, the Petitioner alleged that his counsel was ineffective and that his insufficiency of the evidence claim was impacted by the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177  (2004).  The Petitioner contended that the expert testimony set forth at trial, specifically the testimony of two Suffolk County medical examiners, improperly relied on hearsay, in violation of the Petitioner's right to confrontation.  The Petitioner further contended that because the defense's expert witness disagreed with the prosecution's expert witnesses regarding the cause of Kayla's death, the evidence was insufficient to support his conviction.

The Petitioner further claimed that the prosecutor made inflammatory and prejudicial remarks throughout trial.  Specifically, the Petitioner alleged that the prosecutor made emotionally charged statements regarding the death of a child.  However, the Petitioner admitted that the Court reprimanded the prosecutor stating "Don't put anything like that on the record because you know that's reversible error. You're going to use the death of a child, that what you're going to use?  Don't even use it in your closing."  The Petitioner claimed that despite the Court's warning,

during summation, the prosecutor continued to make prejudicial comments about the death of a child.

In addition, the Petitioner complained that the prosecutor made inappropriate references to the defense's witnesses, including a comment that a witness was "either a medical incompetent or a medical whore." Again, as the Petitioner admitted, the Court struck the prosecutor's comments and reprimanded the prosecutor. Further, the Petitioner contended that the prosecution improperly submitted DNA evidence demonstrating the presence of semen, which was prejudicial to the Petitioner at trial because the prosecution's theory was that the Petitioner had sodomized Kayla with a crutch. The Petitioner claims that the prosecution further improperly submitted testimony from a computer expert demonstrating that the Petitioner viewed pornography on his computer prior to Kayla's death.

Finally, the Petitioner alleged that his confessions should have been precluded as involuntary because at the time of his confessions, Bodenburg was 20 years old; he had limited experience with law enforcement; he had been awake for 24 hours; he was unemployed; and he was in an "emotionally and physically deprived state." The Petitioner claimed that he was interrogated for 12 hours and that the interrogation was "confrontational."

On March 31, 2006, this Court determined that Bodenburg's ineffective assistance of counsel claim was unexhausted. As a result, the Court ordered that the

Petitioner had thirty days to either (1) request a stay and return to the state court to exhaust his claim of ineffective assistance; or (2) amend and resubmit the habeas petition to present only exhausted claims. On April 21, 2006, the Petitioner filed an amended habeas petition. Pursuant to this Court's Order, Bodenburg eliminated his ineffective assistance of counsel claim, presently seeking review only of his remaining claims.

**B.     Factual Background**

On August 30, 1999, three-year-old Kayla died immediately following **a** period in which she was in the Petitioner's care. That night, Kayla's mother, Tori Zachman ("Tori"), left Kayla and Bodenburg's infant son, Mikey, with Bodenburg. Tori was Bodenburg's girlfriend at this time**.** The Petitioner babysat for the children at Tori's father's house located at 1011 Portion Road in Farmingville, Suffolk County, New York.

1.     <u>The Prosecution's Huntley Hearing and Trial Testimony</u>

a.  Testimony of Police Officer George Lewis

On the evening of August 30, 1999, Police Officer Lewis, while on regular patrol, received a call complaining of a two-year-old child having trouble breathing. Officer Lewis arrived at 1011 Portion Road, Farmingville, at roughly the same time as the Farmingville Rescue First Responder. At the time Officer Lewis entered the

dwelling, rescue was performing C.P.R. on Kayla in a kitchen/living room. Kayla was then transported to Stony Brook Hospital. (H. 7-9; Tr. 104-08).[1]

Officer Lewis spoke to the Petitioner while waiting for information regarding Kayla's condition. The Petitioner told Officer Lewis that "he was up all night and didn't get to sleep. His girlfriend left him to watch the children and he dozed off. And he woke up and saw [Kayla] sitting on the floor slumped over. There was a bottle of Amaretto laying next to her." Officer Lewis asked whether the bottle was full and the Petitioner responded that "not too much was missing from the bottle." Officer Lewis further testified that the Petitioner stated, while crying, that his girlfriend was going to kill him and that she had him arrested a couple of weeks earlier. Officer Lewis testified that he did not threaten Bodenburg and that Bodenburg was cooperative. (H. 10-11; Tr. 110-11).

b.      Testimony of Detective James A. Roys

On August 30, 1999, Detective Roys arrived at 1011 Portion Road at 9:34 p.m. Detective Roys spoke with the Petitioner and he explained that he woke up from a nap and found Kayla on the kitchen floor with a bottle of Amaretto. He said that she was

References to "H." refer to the transcript of the Huntley hearing.
References to "Tr." refer to the transcript of the trial testimony and proceedings.

unresponsive and that he yelled to her and shook her to no avail. He then called 911. (H. 32-35; Tr. 148-51).

At about 10:10 pm Detective Roys asked the Petitioner whether he would agree to go to police headquarters and give a statement to the police regarding the events of that night. The Petitioner agreed. At 10:25 pm, Detective Roys, Detective Anderson and the Petitioner arrived at police headquarters. The Petitioner was not under arrest and was not handcuffed. (H. 37-41; Tr. 154-62).

At 10:45 pm, after learning that Kayla had suffered anal trauma, Detective Roys advised the Petitioner that he was going to give him his constitutional rights. Detective Roys read the Petitioner his Miranda rights and provided a card to the Petitioner, detailing his rights, so he could read along. The Petitioner stated that he understood his rights, initialed the standard issue Miranda card and waived his right to counsel. (H. 42-48; Tr. 164-69).

The Petitioner explained to Detective Roys that he had stayed at his friend's house the night before and that he, Tori, Kayla, and Mikey had arrived at Tori's father's house at about 3:00 or 3:30 p.m. The Petitioner stated that he was supposed to watch Kayla and Mikey while Tori and a friend went out. Alone with the children, the Petitioner explained that he watched television and used the computer. The Petitioner stated that, at about 7:30 pm, he dozed off on the couch while watching television and awoke to the banging of a bottle. He claimed that he found Kayla in the

kitchen with a bottle of Amaretto between her legs and called the paramedics. (H. 48-53; Tr. 175-80).

Detective Roys testified that he asked whether there had ever been an accusation regarding the Petitioner's conduct with Kayla and the Petitioner stated that Kayla had accused him of touching her "private parts." The Petitioner stated that the accusations were not true and that "all he did was touch her butt." When Detective Roys inquired further, the Petitioner explained that he had spanked Kayla in the past. (H. 54-55; Tr. 181).

Although the Petitioner claimed he had not done anything to hurt Kayla on August 30, 1999, the Petitioner admitted that he spanked her that day. Detective Roys then asked if Bodenburg had touched her "asshole" and the Petitioner denied that he could have touched her there. Detective Roys defined pedophile to the Petitioner as "a person that had a sickness, they touch children inappropriately and they need to be treated and helped." Detective Roys also explained that there was a team of experts going over the house including people from the crime laboratory and other detectives. Detective Roys explained that if there was evidence of anything that happened in the house, the police would find it**.** (H. 55-58; Tr. 184–85).

Detective Roys testified that at this point Detective McAlvin took over the questioning. Detective Roys testified that he took the Petitioner to the restroom once or twice during the night. According to Detective Roys, the Petitioner never asked for

an attorney and never asked him to stop the questioning. Detective Roys said that he did not threaten the Petitioner at any time during their conversations in the house, squad car, or at headquarters and the Petitioner was cooperative throughout the interviews. (H. 60-61; Tr. 187-89).

c. Testimony of Detective Gerard McAlvin

Detective McAlvin testified that he began interviewing the Petitioner at about 1:10 am on August 31, 1999. He began by introducing himself to the Petitioner and reading the Petitioner his Miranda rights off a Miranda warning card. The Petitioner agreed to speak with Detective McAlvin without an attorney. The Petitioner told Detective McAlvin that at around 3:30 p.m. Kayla was watching television and Mikey was in his car seat and that the Petitioner began picking up papers around the house. While cleaning, the Petitioner explained, Kayla was throwing papers around and making a mess, so he became annoyed and "smacked her in the butt." The Petitioner further stated that he made Kayla stand in the corner for a short period of time. The Petitioner explained that at this point he began e-mailing friends on the computer and attempted to order a movie from the Playboy website. (H. 120-28; Tr. 241-54).

The Petitioner stated that he was watching television at about 7:00 pm and fell asleep at about 7:30 pm. The Petitioner stated that when he awoke at about 7:45 pm, Kayla was sitting on the kitchen floor slumped over a bottle of Amaretto. The Petitioner told Detective McAlvin that "he was pissed . . . he went over there and

picked up Kayla by the arm . . . grabbed her by the right arm.  Pulled her up . . . He hit her in the butt."   The Petitioner explained that Kayla began walking away and crying, so he kicked her.   The Petitioner then stated that because Kayla was moving slowly, he threw the television remote control at her.   The Petitioner told Detective McAlvin that Kayla was crying and afraid to go into a dark room.  The Petitioner stated that he grabbed Kayla, took her into the room, threw her on the bed face down, and she kept crying and yelling.   The Petitioner became even more angry, so he held Kayla down and spanked her.   Kayla yelled and cried "Daddy, stop."   The Petitioner stated that he pulled down her shorts and underwear and  hit Kayla's bare bottom.  (H. 129-33; Tr. 254-58).

At this point, Detective McAlvin  told the Petitioner that doctors had informed him that Kayla had been sodomized.   Detective McAlvin testified that he accused the Petitioner of sodomizing Kayla.  Detective McAlvin testified that he "continually accused him of sodomizing the girl, putting his penis in her, and he continually denied it.  And I told him, I said, well, those injuries just didn't happen, I mean they just don't appear . . . something happened . . . And I continually challenged him."   Bodenburg then admitted that he held Kayla down and put two or three fingers into her anus.   He told Detective McAlvin that he pushed hard because Kayla would not stop crying. After Detective McAlvin continued to accuse the Petitioner of sodomizing Kayla with

his penis, the Petitioner stated that he had used a stick, specifically the bottom part of a crutch, to hit Kayla.  (H. 134-35; Tr. 259-62).

Detective McAlvin testified that at this point the Petitioner admitted that he continued to hit Kayla in the face and took a pillow and put it over her face and held it to her face.   The Petitioner admitted that the child rolled over and he held her down and pushed her face into a pillow.  He admitted that he pushed very hard and Detective McAlvin testified that Bodenburg got down on the floor of the interrogation room and physically demonstrated how he had hit and held down Kayla.   The Petitioner told Detective McAlvin that when he finally let go of her, Kayla was shaking, her fists were clenched and she was gasping and choking.   The Petitioner said he called 911 and told the 911 operator that Kayla was unconscious from drinking.  (H. 136-39; Tr. 263-65).

Detective McAlvin testified that he asked the Petitioner if he was willing to make a written statement and the Petitioner agreed to do so.   Detective McAlvin again read Bodenburg his Miranda rights.   Bodenburg again declined to contact an attorney.  Bodenburg began to draft a written statement at about 2:00 am, detailing the events leading up to Kayla's death.   The statement was completed by 4:00 am.  (H. 140-52; Tr. 267-78).

During Detective McAlvin's testimony in Court, he read Bodenburg's statement into the trial record.   In his written statement, Bodenburg admitted the same

facts set forth in Detective McAlvin's testimony regarding Bodenburg's oral confession.  (H. 147-52; Tr. 279-82).

d.      Testimony of Michelle Mulnard Curtin

Curtin, a volunteer at the Farmingville Fire Department,  testified that  when she arrived at 1011 Portion Road she "found the baby laying on the floor and a man leaning over the baby."  She also testified that she did not see any Amaretto in the kitchen and that she did not see or smell any alcohol on the child's clothing.   She testified that she smelled a faint smell of alcohol when administering C.P.R. to Kayla.  Curtin also testified that while in the ambulance she noticed cuts in Kayla's mouth and bruising on her abdomen and hips.  She further testified that she noticed "no real distinct odor or taste of alcohol" on Kayla's breath while performing "mouth-to-mouth."  (Tr. 55-65).

e.      Testimony of Dr. Stuart Dawson

Dr. Dawson, the Deputy Chief Medical Examiner for Suffolk County, performed Kayla's autopsy and testified at trial.  When asked to explain the steps that are taken to complete an autopsy, Dr. Dawson explained that the medical examiner must obtain information and history from examinations and investigations by the police.  Once there is some background information, an autopsy is conducted, including a physical examination.  In addition, various samples of tissue and fluids are

sent to a laboratory for testing. (Tr. 932-33). Thereafter, a report and cause of death can be issued.

Dr. Dawson testified that he performed Kayla's autopsy on August 31, 1999 and September 1, 1999. Upon physical examination, Dr. Dawson observed various external signs of injury, including bruising and scraping of the face, head, abdomen, chest, mouth, cheeks, buttocks, thighs, legs and arms. The anal sphincter was abnormally lax and dilated. Dr. Dawson testified that it was possible that the injuries to Kayla's anus were caused by a crutch. He further testified that the injury was likely the result of the insertion of something. Dr. Dawson also discovered hemorrhaging in Kayla's brain. (Tr. 934-50).

Dr. Dawson testified that there was alcohol in Kayla's brain tissue, one blood site and stomach contents. Kayla's brain tissue showed an alcohol level of zero point zero one percent. Dr. Dawson stated that, in his opinion, alcohol had nothing to do with Kayla's cause of death. He further noted "[i]n my opinion, her death was caused by blunt force trauma and smothering." He stated that Kayla had brain swelling and hemorrhaging, indicating serious trauma to her brain. Dr. Dawson further stated that the injuries occurred within minutes or a couple of hours of Kayla's death. (Tr. 964-65).

Dr. Dawson further found that smothering was a cause of death. He testified that Kayla had bruising on her tongue, consistent with smothering. He also testified

that he reached his conclusion regarding smothering from a combination of physical findings, laboratory tests, and history, including Bodenburg's confessions. Dr. Dawson testified that the history of the case was related to him by a Suffolk County police detective. Dr. Dawson did not testify regarding the information provided to him by the detective. (Tr. 976).

He also testified that, in order to obtain the necessary history, he viewed parts of Bodenburg's videotaped confession shortly after he performed the physical autopsy. Dr. Dawson testified that either blunt force trauma, smothering or a combination of the two could have caused Kayla's death. (Tr. 967-70; 983).

On cross-examination, the Petitioner's attorney questioned Dr. Dawson regarding his communication with the Suffolk County police, and counsel specifically stated, on the record, that according to Dr. Dawson's notes, the lead supervising detective, Detective-Sergeant Fandrey, informed him on August 31, 1999 that Bodenburg had admitted to smothering Kayla. Bodenburg's counsel then introduced Dr. Dawson's notes from his conversation with the Suffolk County police into evidence. On cross examination, Dr. Dawson again stated that, based on the history conveyed by Detective Fandrey, the confessions, physical examination and autopsy, the findings are consistent with a cause of death of smothering. (Tr. 989-90; 995).

f.      Testimony of Dr. Charles Wetlie

Dr. Wetlie, the Chief Medical Examiner for Suffolk County, also testified at the trial.  Dr. Wetlie testified that his office has a policy requiring a routine meeting approximately two weeks after the completion of the autopsies of every homicide victim and every death in police custody.  The meetings are attended by the homicide sergeants, the lead detectives, the medical examiners who performed the autopsies, the toxicologists, members of the crime laboratory and Dr. Wetlie.  As per this policy, a meeting was held following Kayla's autopsy.  (Tr. 1340; 1347)**.**

Dr. Wetlie testified that Dr. Briglia, a toxicologist who performed laboratory tests regarding Kayla's autopsy, was present at the meeting.   Dr. Wetlie stated that "no one ever considered seriously that [alcohol intoxication] was remotely a cause of death."  At the meeting they discussed the fact that Kayla had ingested alcohol.    Dr. Wetlie testified that the level of alcohol ingested by Kayla was "extremely small" and could not have endangered her life.  Dr. Wetlie further testified that in children, death from smothering can leave no mark whatsoever and medical examiners must rely on circumstances and history to make a diagnosis.   Dr. Wetlie testified that, in such circumstances, medical examiners must incorporate everything they know about a case in order to certify a cause of death, including history, circumstances, events and autopsy findings.  Dr. Wetlie stated that he agreed with Dr. Dawson's assessment that

Kayla died from smothering, head trauma or a combination of the two.  (Tr. 1340; 1347-56; 1363-64).

    2.      <u>The Defense's Case</u>

Dr. Louis Roh testified on behalf of the defense.  At the time of trial, he was the Westchester County Deputy Chief Medical Examiner.  Dr. Roh testified that he read all of the material, including the autopsy report and medical reports, regarding Kayla's death.   Dr. Roh stated that, in his opinion, Kayla died as a result of alcohol intoxication.   Dr. Roh testified that, according to the hospital records, Kayla had a blood alcohol level of 0.05 percent, which was very high for a female three year old child.   Dr. Roh testified that the hemorrhaging in Kayla's brain would not have been fatal.   Dr. Roh further testified that, according to the autopsy report, there was no evidence of smothering.  (Tr. 1073-78).

    3.      <u>The Petitioner's Confessions</u>

As previously discussed and set forth in Detective McAlvin's testimony, Bodenburg confessed to police that he threw Kayla on a bed, hitting her hard four or five times as he held her face down.  He further told police that he pulled Kayla's shorts down and placed two or three of his fingers up to his knuckles in her anus.  He admitted that he then placed a pillow over her face and when he stopped she was choking and gasping for air.  He confessed that he then called 911 and told the operator that Kayla had ingested Amaretto.  At 2:00 am, Bodenburg gave police a

written statement, essentially identical his oral confession. At 8:00 am he again confessed in a videotaped statement.

Prior to trial, the Petitioner moved to suppress his oral, written and videotaped confessions. At the Huntley hearing, the Court heard testimony from Officer Lewis and Detectives Roys and McAlvin. The Court determined that the Petitioner's confessions were voluntary. The Court found that the Petitioner voluntarily agreed to accompany Detectives Roys and Anderson to police headquarters and Bodenburg was not restrained or handcuffed. When Detective Roys learned that Kayla had sustained trauma to her anus, Detective Roys gave Bodenburg his Miranda rights in a clear manner and Bodenburg agreed to waive his rights.

The Court determined that "the circumstances existing at the time of this waiver (his age, unemployment and homeless status, emotional being, and his isolation from others while at police headquarters) are collectively insufficient for this court to conclude that the waiver was not knowingly, intelligently or voluntarily made by the defendant." The Court further found that Bodenburg was again given his Miranda rights and waived them again. Further, the Court determined that despite Detective McAlvin's accusatory tone and the hours of interrogation, Bodenburg was not coerced and always maintained the freedom to end police questioning. In addition, the Court found that during his videotaped confession, Bodenburg was calm, cooperative and responsive and there was no evidence that he had been coerced or threatened.

**C.    State Court Review**

After conviction, the Petitioner was sentenced to an indeterminate term of 25 years to life imprisonment.  The Petitioner appealed his conviction to the Appellate Division, Second Department.  On appeal, the Petitioner alleged that the Court improperly denied his motion to suppress his oral, written and videotaped confessions, claiming they were the products of coercion.  The Petitioner further alleged that the evidence was insufficient to support his conviction because at trial, conflicting testimony was presented regarding Kayla's cause of death.  Finally, the Petitioner claimed that his sentence was excessive and that the prosecutor committed misconduct.

The New York Appellate Division, Second Department, affirmed Bodenburg's conviction.   People v. Bodenburg, 7 A.D.3d 534, 775 N.Y.S.2d 595 (2d Dep't 2004). The Second Department determined that the hearing court properly refused to suppress Bodenburg's confessions; that the evidence was legally sufficient to establish Bodenburg's guilt beyond a reasonable doubt; and that the sentence was not excessive. Id.  The Court further noted that Bodenburg's "remaining contention [was] not preserved for appellate review."  Id.   The New York Court of Appeals denied leave to appeal.  People v. Bodenburg, 3 N.Y.3d 657, 816 N.E.2d 572, 782 N.Y.S.2d 699 (2004).

## II. DISCUSSION

**A.      Standards of Review**

The Antiterrorism and Effective Death Penalty Act (the "AEDPA") provides that a federal habeas court may grant habeas relief to state prisoners with respect to any claim that was adjudicated on the merits in state court proceedings only if the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also DeBerry v. Portuondo, 403 F.3d 57, 66 (2d Cir. 2005) (discussing the federal habeas review standard set forth in Section 2254).  It is well-settled that a state court's findings of fact are entitled to a "presumption of correctness" that the petitioner in question must rebut by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

"A state-court decision is 'contrary' to clearly established federal law within the meaning of § 2254(d)(1) if it is 'diametrically different' from, 'opposite in character or nature' to, or 'mutually opposed' to the relevant Supreme Court precedent."  Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (quoting Williams v.

Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)) (internal

quotation marks omitted).  "A state court decision involves 'an unreasonable

application' of clearly established Federal law if the state court applies Federal law to

the facts of the case in an objectively unreasonable manner."  Brisco v. Phillips, 376 F.

Supp. 2d 306, 311 (E.D.N.Y. 2005); see also Brown v. Payton, 544 U.S. 133, 125 S.

Ct. 1432, 1439, 161 L. Ed. 2d 334 (2005) (citing Williams, 529 U.S. at 405, 120 S. Ct.

1495); Serrano v. Fischer, 412 F.3d 292, 296 (2d Cir. 2005) (citations omitted).  "[I]it

is well-established in [this] Circuit that the 'objectively unreasonable' standard of

§ 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness

beyond error in order to obtain habeas relief."  Rosa v. McCray, 396 F.3d 210, 219 (2d

Cir. 2005) (citing Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003)).

Under the AEDPA, a court does not decide "whether the state court correctly

interpreted the doctrine of federal law on which the claim is predicated, but rather

whether the state court's interpretation was unreasonable in light of the holdings of the

United States Supreme Court at the time."  Brown v. Greiner, 409 F.3d 523, 533 (2d

Cir. 2005); see also Williams, 529 U.S. at 405, 120 S. Ct. at 1495.

It is well-settled that "federal habeas corpus relief does not lie for errors of

state law."  Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606

(1990)).  In this regard, the United States Supreme Court opined that "it is not the

province of a federal habeas court to reexamine state-court determinations on state-law

questions." See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). On the contrary, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68, 112 S. Ct. 475 (citations omitted).

**B.      As To The Claims of Prosecutorial Misconduct**

"The Supreme Court has instructed federal courts reviewing habeas petitions premised upon prosecutorial misconduct to distinguish between ordinary trial error of a prosecutor and . . . egregious misconduct . . . amounting to a denial of constitutional due process." Goines v. Walker, No. 97-cv-3512, 2000 WL 976657, at *68 (E.D.N.Y. July 12, 2000) (quoting Donnelly v. DeChristophoro, 416 U.S. 637, 647-48, 94 S. Ct. 1868, 1873, 40 L. Ed. 2d 431 (1974)) (internal quotation marks omitted). The Court must determine whether the prosecutor's actions "were so prejudicial that they rendered the trial fundamentally unfair.'" See Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986) (citation omitted); United States ex rel. Haynes v. McKendrick, 481 F.2d 152 (2d Cir. 1973)); see also Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998) (quoting Bentley v. Scully, 41 F.3d 818, 823 (2d Cir. 1994)) ("To be entitled to relief, [a petitioner] must show 'that he suffered actual prejudice because the prosecutor's comments [at trial] **. . .** had a substantial and injurious effect or influence in determining the jury's verdict."). The Court must consider "the severity of the misconduct; the measures adopted to cure the misconduct; **. . .** and the certainty of

conviction absent the improper statements." Tankleff, 135 F.3d at 252 (citations omitted).

Initially, the Court notes that in affirming the Petitioner's conviction, and specifically, addressing the Petitioner's prosecutorial misconduct claim, the Appellate Division stated that Bodenburg's "remaining contention [was] not preserved for appellate review." People v. Bodenburg, 7 A.D.3d 534 (2d Dep't 2004). Procedural waiver under state law "constitutes an independent and adequate state ground that bars federal consideration of the substantive claim on habeas corpus." See Gonzalez v. Sullivan, 934 F.2d 419, 421 (2d Cir. 1991). The petitioner did not show "cause and prejudice" for his default and, thus, the claim is procedurally barred.

However, to complete the record, on the merits, the Petitioner alleges that the prosecutor made improper comments during trial, including emotionally charged comments regarding the death of a child and insulting comments regarding the defense's expert medical witness. First, as the Petitioner admits, the Court reprimanded the prosecutor for making emotional statements regarding the death of a child and struck the statements from the record. Similarly, the Petitioner also admits that the Court struck the prosecutor's statements regarding the incompetency of the defense's medical witness, again reprimanding the prosecutor for such references.

Moreover, courts have held that "[g]enerally, issues concerning the propriety of comments made by a prosecutor during summation do not present meritorious

federal questions." Barclay v. Spitzer, No. 02-CV-02184, 2003 U.S. Dist. LEXIS 26440, at *42-43 (E.D.N.Y. Sept. 29, 2003) (citing United States v. Robinson, 485 U.S. 25, 99 L. Ed. 2d 23, 108 S. Ct. 864 (1988)).  Further, criminal convictions "'[are] not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding." Id. (citing United States v. Young, 470 U.S. 1, 11, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (1985)).  A prosecutor's comments are not "grounds for granting the writ unless the comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 94 S. Ct. 1868 (1974)).  "Courts must consider the probable effect a prosecutor's statements would have on the trier of fact's ability to judge the evidence fairly." Dumas v. Strange, No. 00 CV 963, 2002 U.S. Dist. LEXIS 13597, at *41 (D. Conn. July 3, 2002).

In the present case, the conduct by the prosecutor, although improper, was not severe, and the trial judge struck various of the prosecutor's comments from the record, which cured any prejudice that resulted from the improper comments. See Pretlow v. Lord, No. 03 CV 2547, 2005 WL 1073609, at *3 (E.D.N.Y. Apr. 29, 2005) (finding no prosecutorial misconduct where the trial judge sustained objections to improper questions).  Notably, "the case was a bench trial, so it was not a situation where the judge could have attempted to cure any prejudice by an instruction to the jury." Dumas, 2002 U.S. Dist. LEXIS at *42-43.  Moreover, "a judge is presumed to

have considered only admissible evidence in making [his] findings." Id. Finally, "even if the prosecutor's comments were improper, they did not affect the certainty of conviction." Id. Accordingly, the Petitioner's prosecutorial misconduct claims are without merit.

Within the prosecutorial misconduct section of his memorandum, the Petitioner also claims that the prosecution improperly, and prejudicially, introduced DNA evidence demonstrating the presence of semen. The Petitioner further claims that the prosecution improperly introduced evidence that he viewed pornography on a computer prior to Kayla's death. Although set forth as claims of prosecutorial misconduct, the Petitioner appears to claim that evidentiary errors were made.

"For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial." Barclay, 2003 U.S. Dist. LEXIS at *32-33 (citing United States v. Agurs, 427 U.S. 97, 108, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976)). The Court must determine "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, highly significant.'" Id. (citing Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985)).

In the present case, there is no evidence that the admission of the DNA or computer evidence denied the Petitioner a fundamentally fair trial. In light of the entire record before the judge, there was a sufficient basis for the Petitioner's conviction, despite the presence of this evidence. Moreover, as previously discussed, "a judge is presumed to have considered only admissible evidence in making [his] findings." Dumas, 2002 U.S. Dist. LEXIS at *42-43. In addition, as the Petitioner admits, during the trial when discussing the computer evidence, the Court noted that the Court had faith in its own ability to segregate and disregard prejudicial evidence, as opposed to a jury's ability to weigh the evidence. As this was not a jury trial, there is no evidence that the Petitioner was prejudiced.

**C.    As To The Confrontation Clause Claim**

"The Confrontation Clause of the Sixth Amendment, which applies to the states through the Fourteenth Amendment, guarantees the defendant in a criminal prosecution the right to confront the witnesses against him." Henry v. Speckard, 22 F.3d 1209, 1214 (2d Cir. 1994) (citing Pointer v. Texas, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)); see also Cotto v. Herbert, 331 F.3d 217, 229 (2d Cir. 2003) (citing Davis v. Alaska, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)). "This right, however, may be subject to limitations imposed by the trial court. Indeed, 'trial court judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination.' " Lugo v.

Edwards, No. 97 Civ. 7789, 1998 WL 601080, at *2 (S.D.N.Y. Sept. 9, 1998) (citing

Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed.2d 674

(1986)).

"Generally speaking, the Confrontation Clause guarantees an opportunity for

effective cross-examination, not cross-examination that is effective in whatever way,

and to whatever extent the defense might wish." Delaware v. Fensterer, 474 U.S. 15,

20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985). "A violation of a defendant's

confrontation rights does not, standing alone, require reversal of a judgment of

conviction." Cotto, 331 F.3d at 253. "Rather, [a] violation[] of the Confrontation

Clause [is] subject to harmless error analysis." Id. (citing Van Arsdall, 475 U.S. at

684, 106 S. Ct. 1431).

The Petitioner contends that, in violation of his Sixth Amendment right of

confrontation, the medical examiners that testified for the prosecution, relied on

hearsay. The Petitioner claims that the medical examiners testified that they formed

their opinions as to the cause of Kayla's death in consideration of a physical

examination, tests and history, including conversations with detectives, regarding the

circumstances of her death. The Petitioner contends that, pursuant to the Supreme

Court's decision in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354,

158 L. Ed. 2d 177 (2004), out of court statements of a person who does not appear at

trial of a testimonial nature may not be received against the accused to establish the

truth of what was said unless the declarant is unavailable and the accused had the opportunity to cross-examine the declarant.

However, the Petitioner admits that, according to Second Circuit authority, the 2004 <u>Crawford</u> decision should not be applied retroactively to cases on collateral review. Although both parties correctly make this assertion, contrary to the parties' claims, the <u>Crawford</u> case was decided in March 2004 and the Second Department did not affirm the Petitioner's conviction until May 2004. Therefore, <u>Crawford</u> was decided before the Petitioner's conviction became final. According to the Supreme Court's decision in <u>Teague</u>, the application of new procedural rulings is barred in the collateral review of convictions that became final before those rulings were announced. <u>Teague v. Lane</u>, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). However, in this case, the ruling was announced before the Petitioner's conviction became final. Therefore, applying <u>Crawford</u> in this case would not be "retroactive."

Moreover, the Supreme Court mandates "that federal courts decide habeas corpus petitions not with reference to the Supreme Court's current jurisprudence, but rather with reference to the Supreme Court jurisprudence as of either the date of the pertinent state court 'adjudication on the merits,' or the date when the state court conviction became final." <u>Mungo v. Duncan</u>, 393 F.3d 327, 333-334 (2d Cir. 2004). In this case, the Court must decide this petition with reference to <u>Crawford</u> because that is Supreme Court jurisprudence as of the date of the Second Department's

adjudication and the date when Bodenburg's conviction became final, following the Court of Appeals' denial of leave to appeal.

However, despite the issuance of the <u>Crawford</u> decision while the Petitioner's case was on appeal to the Second Department, the Petitioner did not make any claim regarding the issue in state court. In fact, although the Petitioner now cites to <u>Crawford</u>, as well as much earlier cases, <u>Ohio v. Roberts</u>, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980) and <u>White v. Illinois</u>, 502 U.S. 346, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992), the Petitioner failed to allege any confrontation clause violation on appeal. All three cases relied upon by the Petitioner in his present petition existed at the time of the state court's review of the Petitioner's conviction. Although unaddressed by the parties, it appears that the Petitioner did not exhaust this claim.

In general, pursuant to AEDPA, a federal court may not grant a writ of habeas corpus to a state prisoner unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1). If the petitioner presents a claim that is unexhausted, the court may only decide that claim under limited circumstances, such as if the petitioner has no available corrective process in the State or if exhausting such process would be futile. <u>Id.</u> Nevertheless, a federal court is free under the statute to deny an application for a writ of habeas corpus on the merits, regardless of whether the applicant exhausted the remedies available in the courts of the State. <u>Id.</u>

In the present case, although apparently unexhausted, the Petitioner's claim is without merit and therefore, exhaustion would be futile.

The Petitioner's contention that Dr. Dawson and Dr. Wetlie relied on improper hearsay is without merit. According to the Second Circuit

> Experts are generally permitted to rely on otherwise inadmissible evidence in formulating an expert opinion: "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions." United States v. Locascio, 6 F.3d 924, 938 (2d Cir. 1993). Such reliance does not, as a rule, violate a defendant's Confrontation Clause rights. This court has previously concluded that "it is rare indeed that an expert can give an opinion without relying to some extent upon information furnished him by others." Reardon v. Manson, 806 F.2d 39, 42 (2d Cir. 1986), cert. denied, 481 U.S. 1020, 95 L. Ed. 2d 509, 107 S. Ct. 1903 (1987). An expert may be permitted to rely on such information without interfering with a defendant's Sixth Amendment rights. Id. A defendant's rights under the Confrontation Clause are protected "where the expert is available for questioning concerning the nature and reasonableness of his reliance." Id.
>
> A number of structural mechanisms ensure that an expert's reliance on hearsay furthers, rather than hinders, "the truthfinding process." See Lee, 476 U.S. at 541. First, trial courts exercise the authority to ensure that an expert's testimony rests upon reliable bases and foundation. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-49, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999). Second, as an expert, the witness herself "is assumed 'to have the skill to properly evaluate the hearsay, giving it probative force appropriate to the circumstances.'" Locascio, 6 F.3d at 938 (quoting In re "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985), aff'd, 818 F.2d 187 (2d Cir. 1987), cert. denied, 487 U.S. 1234, 101 L. Ed. 2d 932, 108 S. Ct. 2898 (1988)). Third, expert witnesses are subject to cross-examination. See United States v.

> Feliciano, 223 F.3d 102, 121 (2d Cir. 2000) (finding that
> constitutional problems raised by allowing a law enforcement
> agent to testify as both an expert and fact witness while relying on
> otherwise inadmissible hearsay were mitigated by "the
> opportunity, which [defense counsel] seized, to explore on
> cross-examination the limitations of [the witness'] experience and
> his testimony"). On cross-examination, an attorney is free to
> challenge an expert's methodology, her conclusions, and the bases
> for her conclusions. To the extent that the reliability of certain
> facts accepted by an expert is questionable, the exercise and
> process of cross-examination allow a defendant to bring any such
> factual disputes to the attention of the jury.

Howard v. Walker, 406 F.3d 114, 127 (2d Cir. 2005).

Although Dr. Dawson and Dr. Wetlie testified that they relied upon certain history in the case, including information obtained from detectives, in determining Kayla's cause of death, expert witnesses may properly testify to opinions based on hearsay. Howard, 406 F.3d at 127. Moreover, on direct examination, although Dr. Dawson noted that in reaching his conclusions regarding Kayla's cause of death, he relied upon information from detectives and Bodenburg's confessions, Dr. Dawson did not relay to the Court the information he received from detectives. As a result, Dr. Dawson did not relay hearsay, but rather, merely explained what factors he used to reach his conclusions. In addition, although Dr. Wetlie also explained the factors that medical examiners rely upon to reach conclusions, he did not testify as to what he was told by detectives and other non-testifying witnesses.

Further, the Petitioner's trial counsel cross-examined Dr. Dawson and Dr. Wetlie and was able to question them about their conclusions, methodology and the

bases for their conclusions.    Howard, 406 F.3d at127.  In addition, although the

Petitioner now contends that the medical examiners testified regarding history as it

was relayed to them by detectives, it was only during defense counsel's cross-

examination of Dr. Dawson that such information was specifically elicited by defense

counsel.  In this regard, defense counsel asked Dr. Dawson what detectives had told

him and defense counsel introduced into evidence Dr. Dawson's notes from his

conversations with detectives.  The Petitioner himself, not the prosecution, solicited

this specific information.

      The medical examiners properly testified and the defense freely cross-

examined the witnesses.  Further, any violation is subject to harmless error analysis.

Cotto, 331 F.3d at 253.   Accordingly, the Petitioner's confrontation clause claim is

without merit.

**D.      As To The Sufficiency of the Evidence**

      As with other grounds for relief raised in this petition, a petitioner who

challenges the sufficiency of the evidence supporting his conviction "bears a heavy

burden."  United States v. Griffith, 284 F.3d 338, 348 (2d Cir. 2002) (citing United

States v. Velasquez, 271 F.3d 364, 370 (2d Cir. 2001)).  To obtain habeas corpus

relief, the Court must find that, when viewing the evidence most favorably to the

prosecution, no rational trier of fact could find guilt beyond a reasonable doubt.

Farrington v. Senkowski, 214 F.3d 237, 240-41 (2d Cir. 2000) (citing Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

In addition, the Court must defer to the [fact finder's] determination of the weight given to conflicting evidence, witness credibility, and inferences drawn from the evidence. United States v. Vasquez, 267 F.3d 79, 90-91 (2d Cir. 2001) (citing Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 86 L. Ed. 680 (1942); United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998)). A guilty verdict may not be disturbed if the jury has resolved these issues in a reasonable manner. See id. The Court's "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 506 U.S. 390, 402, 113 S. Ct. 853, 861, 122 L. Ed. 2d 203 (1993). A federal habeas court must "credit every inference that could have been drawn in the state's favor . . . whether the evidence being reviewed is direct or circumstantial." Reddy v. Coombe, 846 F.2d 866, 869 (2d Cir. 1988).

"[I]t is 'the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Douglas v. Fisher, No. 04 Civ. 3494, 2004 U.S. Dist. LEXIS 25329, at *11-12 (S.D.N.Y. Dec. 16, 2004) (citing Jackson, 443 U.S. at 319). After a conviction, when witnesses provide conflicting testimony or evidence, the Court "must

presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. (citing Jackson, 443 U.S. at 326).

In particular, a habeas court "may neither 'disturb the jury's findings with respect to the witnesses' credibility," United States v. Roman, 870 F.2d 65, 71 (2d Cir. 1989), nor "make credibility judgments about the testimony presented at petitioner's trial or . . . weigh conflicting testimony." Arthur v. Beaver, No. 03-CV-4555, 2004 U.S. Dist. LEXIS 20185, at *7-8 (E.D.N.Y. Oct. 8, 2004) (citing Fagon v. Bara, 717 F. Supp. 976, 979 (E.D.N.Y. 1989)). See also Pendergrass v. Herbert, No. 01 Civ. 4668, 2003 U.S. Dist. LEXIS 13721, at *28 (S.D.N.Y. July 16, 2003) (the "Court may not weigh conflicting testimony . . . the mere fact that trial testimony was inconsistent is not enough to sustain a claim for insufficiency of the evidence").

The Petitioner claims that the evidence is insufficient to support his conviction because the defense witness' testimony directly conflicted with the testimony of the prosecution's witnesses. Specifically, Dr. Roh testified that Kayla's cause of death was alcohol ingestion, while Dr. Dawson and Dr. Wetlie testified that Kayla's cause of death was smothering, blunt force trauma or a combination of the two. However, the trial court determined that Dr. Dawson and Dr. Wetlie were credible, and, as such, weighed the conflicting testimony and resolved the conflict in favor of the prosecution. This Court may not now weigh the conflicting testimony; instead, this Court must defer to the determination of the trial court.

Moreover, after reviewing the trial transcript and viewing the evidence in the light most favorable to the prosecution, this Court finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

**E.      As To The Petitioner's Confessions**

Finally, the Petitioner contends that his confessions should have been suppressed as involuntary because at the time of his confessions, he was 20 years old; had limited experience with law enforcement; had been awake for 24 hours; was unemployed; was in an "emotionally and physically deprived state"; was interrogated for 12 hours; and the interrogation was "confrontational."

"The police may use a defendant's confession [obtained during a custodial interrogation]  without transgressing his Fifth Amendment right only when the decision to confess is the defendant's free choice."  Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997) (internal citations omitted).  "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances."  Id. (internal citations omitted).  In this regard, the Second Circuit has stated:

> In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions  of

34

> interrogation, and (3) the conduct of law enforcement officials.
> The relevant characteristics of the individual who confessed are
> the individual's experience and background, together with the
> suspect's youth and lack of education or intelligence. See
> Schneckloth, 412 U.S. at 226; Guarno, 819 F.2d at 30. The second
> circumstance, the conditions under which a suspect is questioned,
> includes the place where an interrogation is held, Mincey, 437
> U.S. at 398 ("It is hard to imagine a situation less conducive to the
> exercise of 'a rational intellect and a free will' than [interrogation
> in a hospital's intensive care unit]."); see also Bram, 168 U.S. at
> 563, and the length of detention, Schneckloth, 412 U.S. at 226.
> The presence or absence of counsel is a significant condition
> because counsel can "assure that the individual's right to choose
> between silence and speech remains unfettered throughout the
> interrogation process." Miranda, 384 U.S. at 469.

Green v. Scully, 850 F.2d 894, 901-02 (2d Cir. 1988). See also Campaneria v. Reid,

891 F.2d 1014, 1019-1020 (2d Cir. 1989) ("A determination as to the voluntariness of

a confession requires an inquiry into all the circumstances surrounding the law

enforcement officials' conduct to ascertain whether it overcame the accused's will to

resist and brought about a confession that was not freely self-determined").

In addition, courts consider the conduct of police officers; the nature of the

questioning; the failure to inform the defendant of his constitutional rights; any

physical mistreatment of the defendant; long restraint in handcuffs; physical

deprivations; and brainwashing or promises of leniency. Green, 850 F.2d at 901-02.

The state court's factual findings are entitled to the presumption of correctness

if it is clear that the state court's factual findings were made after extensive

development of the material facts, and are supported by the record. Nelson, 121 F.3d

at 833-834; <u>Ramdeo v. Phillips</u>, No. 04-CV-1157, 2007 U.S. Dist. LEXIS 49483, at *66 (E.D.N.Y. July 9, 2007) ("The findings underlying the State court's voluntariness determination, however, are factual determinations which must be presumed to be correct in a federal habeas corpus proceeding").

In the present case, there is no evidence that the Petitioner's three confessions were involuntary. First, although the Petitioner claims that he was in an emotionally and physically deprived state at the time of his confessions, the Petitioner does not explain this allegation or make any claim that the police abused him, were violent, or that the police deprived him of anything. Although the Petitioner contends that the police were confrontational, during his testimony, Detective McAlvin explained to the Court that he confronted the Petitioner and accused him of beating Kayla. There is no evidence that the Petitioner felt threatened by the police and the Petitioner does not claim that he felt threatened.

Instead, the testimony from the Huntley hearing, as well as the trial, demonstrates that the Petitioner voluntarily agreed to proceed to police headquarters to provide the police with a statement regarding the events of that evening. The Petitioner was not handcuffed or confined during his trip to police headquarters. Once the police discovered the nature of Kayla's injuries, Detective Roys read the Petitioner his Miranda rights and provided a card for the Petitioner to additionally read his rights. The Petitioner signed the card; acknowledged that he understood his rights; and

waived his right to counsel.  The police gave the Petitioner his Miranda rights at least three times during the course of their interrogation and each time the Petitioner waived his right to counsel.

In addition, the testimony demonstrates that the Petitioner was calm and cooperative throughout the course of the interrogation.  At one point, the Petitioner even physically demonstrated to the police how he struck Kayla.  The testimony shows that the Petitioner voluntarily confessed orally, and thereafter, agreed to provide written and videotaped confessions.  At no time did the Petitioner request counsel or request that the police end the interrogation.

Further, although the Petitioner contends that he was interrogated for 12 hours, the testimony shows that the Petitioner did not reach police headquarters until approximately 10:45 pm.  He orally confessed after only a few hours of questioning, shortly after 1:00 am.  By 2:00 am, the Petitioner had agreed to provide a written statement and spent until 4:00 am preparing that statement.  Although the Petitioner did not provide the videotaped confession until 8:00 am, the Petitioner was not in police custody for an excessive amount of time when he first confessed.  Also, the Court finds that although the Petitioner was 20 years old, had been awake for 24 hours and allegedly had limited experience with law enforcement, the confession was voluntary.

In addition, the state court held a Huntley hearing and, based upon the testimony of Officer Lewis and Detectives Roys and McAlvin, determined that the Petitioner's confessions were voluntary. As previously noted, the state court's factual findings are entitled to the presumption of correctness because it is clear that the state court's factual findings were made after extensive development of the material facts, and are supported by the record. Nelson, 121 F.3d at 833-34; Ramdeo, 2007 U.S. Dist. LEXIS at *66.

As such, this Court finds that the Petitioner's confessions were voluntary and properly admitted at trial. His petition in this regard is denied.

## CONCLUSION

Based on the foregoing, the Court finds that the state courts' determinations were not contrary to, or an unreasonable application of, clearly established federal law. Nor were they based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, the petition for a writ of habeas corpus is **DENIED**.

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure and 28 U.S.C. § 2253(c)(2), a certificate of appealability is **DENIED**, as the Petitioner fails to make a substantial showing of a denial of a constitutional right. Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039, 154 L. Ed.2d 931 (2003); Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000).

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
August 4, 2007

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge